(C. D. 1533)

MOHAWK IRON & STEEL CO. v. UNITED STATES

United States Customs Court, Second Division

(Decided June 17, 1953)

*John D. Rode* (*Ellsworth F. Qualey* of counsel) for the plaintiff.
*Charles J. Wagner*, Acting Assistant Attorney General (*Arthur R. Martoccia*, special attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Round forms of an aluminum alloy $\frac{7}{32}$ of an inch in diameter in straight lengths of 88½ and 98½ inches were classified by the collector of customs as wire, pursuant to the provision in

paragraph 316 (a) of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 316 (a)), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, and assessed with duty at the rate of 15 per centum ad valorem.

The plaintiff (importer) claims that the merchandise consists of aluminum rods and that it should be classified as such in accordance with the provisions of paragraph 374 of said act (19 U. S. C. § 1001, par. 374), as modified by the trade agreement, *supra*, and dutiable at 3 cents per pound.

THE STATUTES

Paragraph 316 (a), as modified, *supra*:

\* \* \* \* \* \* \*

All wire composed of iron, steel, or other metal, not specially provided for (except gold, silver, platinum, tungsten, or molybdenum) _____ 15% ad val.

Paragraph 374, as modified, *supra*:

Aluminum, aluminum scrap, and alloys (except those provided for in paragraph 302, Tariff Act of 1930) in which aluminum is the component material of chief value:

\* \* \* \* \* \* \*

In coils, plates, sheets, bars, rods, circles, disks, blanks, strips, rectangles, and squares_____ 3¢ per lb.

The following exhibits, with the exception of exhibit 8 for identification, were offered in evidence, their admissibility being reserved for a ruling by a full bench:

BY THE PLAINTIFF

Illustrative exhibit 1, approximately 22¼ inches long, representing the imported merchandise, except for length.

Collective exhibit 2, a commercial analysis of the material from the "suppliers abroad."

Collective illustrative exhibit 3, several pieces of aluminum in straight lengths of the character of exhibit 1, but varying from ¼ inch to 1 inch in diameter.

Collective exhibit 4, consisting of two types of wire, round and flat, in coils, which, for convenience, were marked illustrative exhibits 4-A and 4-B, respectively.

Illustrative exhibit 5 for identification, a catalog of the Adam Metal Supply, Inc., a warehouse distributor, containing specifications for various aluminum and steel products, referred to in the testimony of the witness Sautter.

Illustrative exhibit 6 for identification, a catalog of the Whitehead Metal Products Co., Inc., containing descriptive matter and specifications relating to aluminum and other metal products, referred to in the record of the witness Sautter.

Illustrative exhibit 7 for identification, a catalog of T. E. Conklin Brass & Copper Co., Inc., relating to aluminum and other metal products, referred to in the testimony of the witness Sautter.

Exhibit 8 for identification, referred to by the witness Kradenski as a sample of aluminum wire 12 inches long on the assumption that it was solid throughout.

Exhibit 9 for identification, a catalog of the Aluminum Co. of America, issued in 1950, entitled "Alcoa Aluminum and Its Alloys," containing definitions, descriptive matter, and specifications for aluminum products, identified by the witness Kradenski.

Exhibit 10, described by the witness Kradenski as page 1 of a catalog issued by the Aluminum Co. of America, dated June 1, 1948, containing certain specifications with reference to "Rod—Round." Heading of page 1 "Alcoa Aluminum Extruded Rod and Bar—Sizes Available Without Die Charge."

BY THE DEFENDANT

Exhibit A, page 1 of a catalog of the Aluminum Co. of America, dated June 14, 1948, containing definitions of wire, rod, and bar, together with other descriptive matter and specifications, referred to in the testimony of the witnesses Miller and Kradenski.

Exhibit B, a "condensed data" sheet of the Aluminum Co. of America, dated February 15, 1929, containing definitions of wire, rod, and bar, together with other descriptive matter, referred to in the testimony of Kradenski.

Exhibit C, pages 1 and 2 of a catalog of the Aluminum Co. of America, dated September 4, 1951, containing definitions of wire, rod, and bar, together with other descriptive matter and specifications, referred to in the testimony of Kradenski.

Exhibit D, pages 1–4–1 and 1–4–2 of a "Reynolds Sales Manual (Alum. Div.)," dated February 5, 1951, containing definitions and other descriptive matter relating to aluminum products, referred to in the testimony of the witness Beneke.

It is now the ruling of the court that all of the exhibits (except exhibit 8 for identification which was not offered in evidence) are received in evidence and marked with their original exhibit numbers as indicated above.

Six witnesses were called to testify in the case, four for the plaintiff and two for the defendant.

Plaintiff's witness, Denis W. Cronin, testified that he was president of the Mohawk Iron & Steel Co. (plaintiff herein), importer and exporter of scrap metal and steel products. He described the importation in controversy as "Prime round aluminum rods, 88½″ x ⅞₂″ in diameter and another item, prime round aluminum rods, 98½″ x ⅞₂″ in diameter." It appears that such merchandise is also imported in

144-inch lengths which, however, are not involved in these proceedings. The witness identified illustrative exhibit 1 as representative of the importation herein except as to length, and also the commercial analysis (exhibit 2) of the material, supplied by the shipper.

When asked how he ordered the merchandise from abroad, Cronin stated that it is always mentioned in the exchange of cables as "rod"; that the bulk of the material had been sold to the Philco Corp., and a small portion to General Materials Corp., "As aluminum rod in cut lengths," in the condition in which it arrived in this country. The witness testified that the rods were used for television antennas by Philco and for that purpose were cut to the length desired. These two corporations are the exclusive buyers of the imported commodity from the plaintiff.

On cross-examination, the witness testified that he had imported aluminum wire for use in the manufacture of zippers and that it was measured in gauges rather than in inches. It was imported in coils of 110 or 112 pounds.

Plaintiff's witness, Alfred W. Sautter, testified that he was vice president of two corporations, one being the E. Taranger Corp., importer of aluminum in all forms, and the Chelsea Aluminum Corp., a warehouse distributor, which he described as a company or group "that maintain an established warehouse at an established location at which point they maintain stocks on hand of material that they are distributing to the trade"; that it deals in aluminum exclusively— "All types, what are commonly referred to as 'semis' aluminum sheets, rods, wire, foil, coils, circulars, extruded shapes."

Sautter stated that he had been with these two corporations approximately 2 years and been in business dealing in aluminum for about 12 years. He testified to his familiarity with the merchandise in issue; that it is similar to the pieces of material received in evidence as exhibit 3; and that it is known in his business as aluminum rods by which name it is sold to his customers. It appears that exhibit 3 consists of various items, ranging from ¼-inch to 1 inch in diameter, cut from straight pieces originally produced in lengths from 12 feet to 24 feet. He described the articles as raw products which have to be fabricated in some way before they can be used—for instance, on automatic screw machines for turning out screws, bolts, nuts, stems, and shafts.

Further, the witness testified—

This rod in the size and dimensions as indicated here in the exhibits that they have on the desk there. (ind.) and in larger diameters than those exhibited there to turn out parts which are commonly used in some cases even for hubs of propellers on aircraft. In some cases they bend the rod and might use it in this form bent into shap [sic] as suggested before, for television antennas.

JUDGE RAO: Are those rods pliable?

WITNESS: Well, they all can be bent, depending upon the diameter, commensurate amount of pressure is required to bend them but they all can be bent.

The witness was then shown exhibits 4–A and 4–B representing what he sold as round wire and flat wire, respectively.

In describing the difference between aluminum rod and aluminum wire, the witness testified—

Well, basically the primary difference is one is in straight lengths and one is in coils. The rod is in straight lengths I would say not exceeding 24 feet whereas wire not only is in coils but it is in undetermined length, usually much in excess of 24 feet. I would say usually in lengths of hundreds of feet.

 *  *  *  *  *  *  *

Wire, generally speaking and I have to give a general answer here because there is no clear line of demarcation, wire generally speaking is what I would term a somewhat finished product but usually it has to be bent into some shape. It is usually not machined any further; whereas, the rod is usually taken and turned on a screw machine or turret lathe.

The witness identified exhibits 5, 6, and 7 as catalogs of New York warehouse distributors in which merchandise like exhibit 3 is advertised as aluminum rod.

On cross-examination, Sautter testified that he had purchased merchandise like exhibit 1 from the Whitehead Metal Products Co., Inc., which he ordered as "Aluminum rod of certain dimensions."

When asked what these dimensions were, he stated—

Well, I would say I have bought every dimension from ³⁄₁₆″ diameter on up since I have been in the aluminum business year in and year out.

X Q. Is ³⁄₁₆″ aluminum, ³⁄₁₆″ diameter aluminum rod so far as you are concerned?—A. Absolutely.

X Q. So far as you are concerned the diameter of the article has nothing whatever to do with its determination as to whether it is rod or wire?—A. No, only the form in which the article comes.

X Q. And in order to be wire, is the form required coils?—A. Yes, in coils and of an indeterminate length, substantially longer than that of a length of rod.

 *  *  *  *  *  *  *

A. The difference between aluminum wire and aluminum rod is that aluminum wire customarily comes in coils of a length usually many times in excess of the length of an aluminum rod, 50 feet, 100 feet, 200 feet, or 500 feet in a coil.

 *  *  *  *  *  *  *

Other than that I would say that wire as I have already mentioned, wire is customarily somewhat a finished product; wire generally is used in the state in which it is purchased. It might be bent but other than that the condition of it generally isn't changed radically, whereas rod is. Rod is generally machined and the dimensions are changed.

The witness stated that wire generally is drawn "from ⅜″ wire drawing rod."

With respect to exhibit 4–A, the witness said that if it came in 12-foot lengths or 24-foot lengths or in coils of 200 feet he would call it

wire, but if "straightened out and cut off at an indeterminate length, 12 feet, 15 feet, it is then rod."

The witness then explained what he meant by "straightening."

If you straighten it out. Just by pulling it out and holding it, doesn't constitute straightening. You have to put it through a machine to make it lie down flat and straight.

JUDGE RAO: When you open up any coil of wire and stretch it out, you don't mean to say it is rod then?—A. No, because then it will still go back in a day or two or try to adhere to its original coil form.

The witness explained that aluminum material less than $\frac{1}{16}$ of an inch in diameter or smaller is always supplied in coils, never in straight lengths; if $\frac{3}{8}$ inch and over in diameter and in coil form, it is called coiled rod.

Howard A. Fromson, president of the Fromson-Orban Co., an affiliate of the Kurt Orban Co., testified that he had been selling aluminum in the form of sheets, extrusions, strips, rod, and fabricated aluminum products such as aluminum doors for approximately 6 years.

When asked if he was familiar with aluminum wire, he testified—

We brought some rod in and Customs classified it as wire.

Q. And is that the wire that you refer to when you say you are familiar with wire?—A. Yes, there isn't a very great difference between rod and wire and if there is one at all, it is an extremely arbitrary one.

He testified that he sold merchandise like exhibits 1 and 3 as rod.

Q. What diameter have you sold as rod?—A. $\frac{1}{4}''$ diameter, up to $3\frac{1}{2}''$ diameter.

He stated that "aluminum wire begins at approximately .080 inches and smaller in diameter. It is generally sold in coils."

Q. How about rod?—A. Anything larger than .080 inches we would consider as a rod.

Q. Whether it is in coils or not?—A. Whether in coils or not.

The witness was of the opinion that flexibility could not be used as a criterion in distinguishing wire from rod.

George F. R. Miller testified that he had been a salesman with the Atlantic Steel & Iron Co., aluminum division, since July 1950, and had been selling aluminum since 1938. Beginning in 1920, he was engaged as a purchasing agent for a manufacturing concern known as Edward F. Caldwell & Co. His duties with that company were, "To buy anything that might be requisitioned by the various departments throughout the organization in the form of metals, woods, glass, all types of materials."

Q. Did you buy aluminum at that time?—A. Yes.

Q. What types of aluminum did you buy?—A. Sheet, coil, tubing, extrusions, rod, wire.

Such purchases were made either from the Aluminum Co. of America, hereinafter referred to as Alcoa, or from local warehouse distributors. The Caldwell company, he testified, "was reputed to do about ten million or eleven million dollars' worth of business a year."

From 1934 to 1936, the witness was incapacitated by reason of illness, but from 1936 to 1938, he was employed as purchasing agent and production manager by Russell Wright, Inc., dealer in sheet aluminum, circles, and tubing.

After purchasing the material it was necessary to schedule it for production and to follow it through to a finished state. From there on it was handed into inventory of a finished product.

From 1938 to 1943, the witness was employed as a salesman by the Strahs Aluminum Co., selling all commercial forms of aluminum, including wire and rod. The aluminum handled by that company was manufactured by Alcoa. After leaving the Strahs company, the witness was for a short time associated with the Aluminum Reserve Corp., metal broker and warehouse distributor, and then for 2 years (from 1948 to 1950), he was in business for himself, strictly as a metal broker, buying and selling aluminum only in the form of sheets, tubing, wire, rod; in fact, all commercial forms.

The witness was shown exhibits 1, 3, 4–A, and 4–B, all of which merchandise he had either bought or sold.

Q. When a person came in and asked you for $\frac{7}{32}$nds of an inch diameter, would you sell the merchandise to him as a wire or rod?

\* \* \* \* \* \* \*

A. Well, I will answer that in "A" and "B". "A", $\frac{7}{32}$nds of an inch wide because it could be tubing also if he said he wanted solid or rod, that is what I would sell him [indicating exhibit 1].

He stated that aluminum wire "can be made by drawing through metal dies material of a larger diameter; it can be rolled and it also can be extruded." When obtained by drawing "It is drawn from a larger size which I think technically in the industry is known as wire rod or wire drawing rod. Now I am not too certain about that."

When asked how rod is made, the witness testified—

That is made by a rolling process, either hot-rolled or cold-rolled or a combination of both.

He testified further that he had dealt in merchandise like exhibits 1 and 3 and that—

\* \* \* whenever I purchased it I would always order it as rod because I was never interested in technicalities so long as I got what I ordered and if upon inspection it met that objective it was acceptable to me. I ordered it as rod.

\* \* \* \* \* \* \*

In selling, if a customer came in and asked me or today if a customer asks me for $\frac{1}{8}$'' rod or $\frac{1}{8}$'' wire if he asked for wire, I would sell him a coil and if he asked for rod I would sell him this shape [indicating exhibit 1].

In describing the difference between wire and rod, the witness testified—

Well, wire to me has always inferred something in coil form, rod has always meant something in straight size regardless of size. There is a matter of technical definition in order to differentiate, but I am not technical and I do not attempt to assume that position here or to be an expert, but in my experience in all the years I have been buying and selling, the only line of delineation between wire and rod so far as I have observed is that wire is something that is in a coil and rod is something that is a straight length regardless of how long it might be, so long as it is straight.

He explained that in the extrusion method aluminum in a semimolten form is "put into a chamber and is forced through a die under pressure and it comes out of the die which has a specific shape, such as spaghetti would." By this process, the witness stated, rod may be obtained in "sizes under 4″ and I believe there are dies available listed in some of the catalogs that indicate that rod can be extruded down to .125 or ⅛ of an inch in diameter."

On cross-examination, the witness was asked if the only difference between wire and rod was that wire comes in coils, to which he answered "Yes."

The witness admitted that if exhibit 4-A were cut into 6-, 8-, or 12-inch lengths and flattened out it would revert to its original shape; that in order to make it stay straight, it would have to be "reprocessed by putting it through another machine for which I think the term is straight hardening which then makes the article retain its straight length." It would then become a rod "because it has been reprocessed."

X Q. So that is it, then your statement is that the diameter of the particular article has nothing to do with the determination of whether it is rod or wire?— A. In my opinion, no. If it is coiled it is wire.

\*          \*          \*          \*          \*          \*          \*

It is generally referred to in the trade as wire, when they want wire, they specify coils. When they want rod they specify 12 foot lengths.

The witness testified that during the time he was with the E. F. Caldwell Co., from 1920 to 1934, he had purchased rod directly from Alcoa in diameters from less than ⅜ inch down to ¼ inch.

John Kradenski, who was called to testify for the defendant, stated that during the past 20 years he has been administrative sales manager or assistant to that officer with Alcoa and that "it is my job and the people who are under me or under my supervision to get all the orders that come in and screen them for specifications and final analysis as to description to classify them categorically to determine the category they may fall in"; that he comes in contact with buyers of the company's products and with other administrative sales managers of his company throughout the United States.

Kradenski testified that on or about June 17, 1930, Alcoa was the only company he knew of engaged in the manufacture and sale of aluminum wire and rod throughout the United States.

The witness testified that the term "aluminum wire" had a definite, general, and uniform meaning in the trade throughout his experience, but, as will appear *infra*, the witness was not employed as a salesman prior to 1932 when he became assistant administrative sales manager. When asked to define the term "aluminum wire," he testified—

Alcoa's determination of aluminum wire is any material or metal under $\frac{3}{8}''$ thick. That constitutes wire. It doesn't make any difference whether it is straight, coiled, round or rectangle shaped, the definite break is $\frac{3}{8}''$, anything under that is classified by Alcoa as wire.

According to this witness, merchandise like exhibit 1 was known as aluminum wire "Because it is under $\frac{3}{8}''$." With respect to exhibit 3, he stated that any of the items which measure $\frac{3}{8}$ inch or under would be aluminum wire and above that would be aluminum rod. Exhibit 4-A he identified as wire and exhibit 4-B as flattened wire.

On cross-examination, Kradenski testified that during the 20 years he was engaged as sales manager the area covered by him was "known as the New York District. We handled all sales going up into Buffalo, coming down to Hartford, Bridgeport area, New York City, all the metropolitan area proper and Newark, say going to about Camden, New Jersey."

When asked about his experience prior to 1932 when he became assistant administrative sales manager for Alcoa, he testified that he was known as an "administrative adminstrator" and that "it was my responsibility at that time to screen all the orders that came into the office before I handed them out to people for actual abstracting them for specifications."

X Q. Prior to 1932 did you do any sales work for Alcoa?—A. No, no direct selling.

X Q. You didn't do any yourself?—A. No.

He testified that merchandise like exhibit 1 could be produced by extrusion after which it would be known as extruded wire.

When asked if he had ever heard of material like exhibit 1 being described as rod, the witness answered—

Yes, I have heard of it, but that is not Alcoa's determination. I have heard of it, I must admit.

X Q. But you have heard other people call it rod?—A. Over the period of years, yes.

Kradenski mentioned Bohn Aluminum and Reynolds Metal Co. as fabricators of aluminum in addition to Alcoa in 1930.

He testified that a great deal of merchandise like exhibit 1 was used at the Alcoa Edgewater, N. J., plant to make up screw machine parts.

It was also used for television antennas, smoking pipe extensions, screws, nuts, and bolts.

X Q. Is it a material as distinguished from a finished product in your opinion in this form?—A. It is not a finished product.

X Q. It is a material?—A. Yes.

\* \* \* \* \* \* \*

X Q. Have you ever received orders in Alcoa which called for classification, rod less than ⅜″ in diameter, round?—A. *Yes, we have but we reclassify them.*

X Q. Then it is true that outside of Alcoa people refer to material such as Plaintiff's Exhibit #1 as rod?—A. *I would say on occasion, yes.*

When asked the reason why Alcoa drew the distinction between wire and rod at ⅜-inch diameter, the witness replied—

I can't answer it, not being the one that set it up. Since Alcoa at that time were the only producers, in my opinion, of aluminum wire, *I think that was an arbitrary setup* to create some breaking point between rod and wire.

X Q. Instituted by Alcoa?—A. That's right.

X Q. And which Alcoa adheres to and has adhered to since the time it was instituted by them?—A. Yes.

X Q. Which is not followed by companies other than Alcoa?—A. *I can't answer that, I don't know.*

The second and last witness called by defendant, Charles J. Beneke, testified that he was coordinator of manufacturing facilities, products, and markets of aluminum production of the Reynolds Metal Co. When asked what his duties entailed, he replied—

I feel qualified to set up a plant, engineer it and make all these products shown here and organize it and have done so. In the first place, I am a registered professional engineer. I have done production engineering on aluminum. I have set up plants to make this product [referring to exhibits 1, 2, 3, and 4].

He had been in the aluminum industry since 1930, having been associated with Alcoa prior to 1940, where he was production engineer in the wire, rod, bar, and cable departments. He explained his duties in the following words—

To qualify, in the first place it is an engineering problem. You have to be sure that the customer gets the same products, day in and day out, that he can use and in order to do that, you have got to have specifications that he can follow to be sure that he gets the same product day in and day out. In setting up those specifications, it was necessary to distinguish between rod, bar wire and so on. The separation point between wire and rod is more than size, for instance, the alloys and tempers supplied in wire are different than those supplied in rod. Wire may be supplied in hard temper, .374, but it is not commercial wire above .374. It is more than a breaking point of size, it is also the physical properties.

He defined aluminum wire as follows:

Aluminum wire is any solid section whose cross-section, that is diameter or greatest dimension is less than ⅜″. In other words, the cross-section may be round, it may be square, it may be hexagon [sic], octagon or rectangular. Solid sections.

That was his understanding since 1930. He testified further—

Q. Is the definition of aluminum wire as you have defined it, any solid piece of aluminum measuring ⅜″ or under definite, general and uniform in the aluminum industry throughout the United States?—A. To those familiar with the trade, yes.

Q. Was that true back in 1930?—A. *After 1930 I can only speak of.*

He knew of no company in the United States manufacturing aluminum wire and rod other than Alcoa in 1930.

Beneke was shown exhibit 1 and stated that it was aluminum wire for the following reasons:

In the first place it is obvious that it is round, in the second place, it is obvious that it is under .375 diameter which automatically places it in the wire category.

When asked if the coiling of a product of the aluminum industry has anything to do with the determination of whether or not it was wire, the witness answered "Absolutely nothing."

\* \* \* If a customer wants to buy welding wire, in the first place, you would want to know the size, you would want to know whether he wanted it in coils or straight lengths. A lot of people use straight length welding wire and other people want to buy it in coils and cut off the lengths they use. So size determines whether it is called wire or rod. *Coils has nothing to do with it, whether it is coiled or straight.*

On cross-examination, Beneke stated that when he was employed by Alcoa, he was in production engineering during the entire time.

X Q. So you did no buying or selling?—A. *That's correct.*

He did, however, have experience in buying and selling with the Reynolds Metal Co. where his experience began in 1940. This witness insisted that ⅜ of an inch in diameter was the dividing line between aluminum wire and rod.

Beneke was asked if he had ever heard of an article like exhibit 1 referred to as rod, to which he replied—

Yes, by people not familiar with the trade.

X Q. And when you say "trade" you mean Alcoa and Reynolds, or do you mean the trade generally?—A. Customers familiar with the use of this product.

He admitted that some customers may have placed orders for merchandise like exhibit 1 as rod, that the differentiation between wire and rod by diameter measurement was established by Alcoa in an apparent effort to insure uniformity in specifications.

X Q. Have you ever heard of material like Plaintiff's Exhibit #1 referred to as rod?—A. Yes, by people not familiar with the practice in the trade.

The plaintiff, in our opinion, has made a *prima facie* case, having established that the imported commodity consisted of "rods" within the commonly accepted meaning of that term.

With respect to the common meaning of the terms "rods" and "wire," our attention has been invited to the following lexicographic

authorities as aids to the understanding of the court in determining the proper meaning of those terms:

Webster's New International Dictionary, 1930 edition—

**rod,** *n.* * * * **1.** A straight and slender stick; * *. * hence, any slender bar, as of wood or metal. * * *

**wire,** *n.* * * * **1.** A thread or slender rod of metal, usually very flexible and circular in cross section. * * *

Funk & Wagnalls New Standard Dictionary of the English Language, 1942 edition—

**rod,** *n.* **1.** A shoot or twig of any woody plant; a straight, slim piece of wood or other material; * * *

**wire,** *n.* **1.** A slender rod, strand, or thread of ductile metal, now usually formed by drawing through dies or holes, but formerly made by hammering. ·Wire varies in diameter from one inch to $\frac{1}{1000}$ of an inch or less, but ordinarily when thicker than $\frac{3}{16}$ of an inch it is termed a *rod*. * * * [Italics quoted.]

Knight's American Mechanical Dictionary (1876)—

· ·**Wire.** A metallic rod, thread, or filament of small and uniform diameter. The largest size, numbered 0000, of the Birmingham wire-gage, has a diameter of .454 inch; but smaller sizes even than this, except when drawn out to considerable lengths, are generally known as bars or rods.

The definitions above quoted coincide with our concept of what is commonly recognized as the distinction between rods and wire. This view is fortified by the physical appearance of exhibits 1 and 3 which illustrate rods of various diameters and offer a striking contrast to exhibits 4–A and 4–B which illustrate the common characteristics of wire. It is pertinent to remark here that the courts have not infrequently recognized the potency and evidentiary value of samples or other physical exhibits in arriving at their conclusions. *United States* v. *Frankel Importing Co.,* 18 C. C. P. A. (Customs) 188, T. D. 44378, and cases cited. Moreover, while the testimony of trade witnesses is in no sense conclusive of the common meaning of statutory language, it is, nevertheless, admissible as an aid to the memory of the court in arriving at the common meaning of various provisions of law. *United States* v. *Doragon Co. et al.,* 13 Ct. Cust. Appls. 182, T. D. 41051; *United States* v. *May Department Stores Co.,* 16 Ct. Cust. Appls. 353, T. D. 43090; and *Robertson* v. *Salomon,* 130 U. S. 412.

· In support of its contention that the imported commodity should be assessed as "rods" rather than "wire," plaintiff's witness, Denis W. Cronin, president of the importing company, testified that the merchandise in controversy had been bought as rod and sold as rod to the Philco Corp. and the General Materials Corp.

Alfred W. Sautter, vice president of the E. Taranger Corp., an importer of aluminum, and also an officer of. the Chelsea Aluminum Corp., a warehouse distributor dealing exclusively in aluminum, with 12 years of experience in the aluminum business, dealing principally

in semifabricated aluminum including sheets, wire, foil, coils, rods, and other forms, obtaining his supplies from both foreign and domestic sources, identified exhibit 1 and collective exhibit 3 as merchandise which he had sold as rods.

Sautter further testified that rods generally come in straight lengths up to 24 feet, whereas wire was usually in coils of indeterminate length, usually in hundreds of feet; that wire is a "somewhat" finished product, while rod is generally machined for its intended purpose. He referred to the Whitehead Products Co., the Adam Metal Co., and T. E. Conklin as competitors of his company who distribute products of Alcoa, Reynolds, and Kaiser, and that he had bought as rod material from $\frac{3}{16}$ of an inch to 1 inch and up from the Whitehead Co.

Howard A. Fromson, president of Fromson-Orban Co., dealer in foreign-made aluminum throughout the United States, testified that while he did not handle aluminum wire, he did sell material such as plaintiff's exhibits 1 and 3 with a diameter of $\frac{1}{4}$ inch up to $3\frac{1}{2}$ inches as rod.

George F. R. Miller, a salesman in the aluminum division of the Atlantic Steel & Iron Co., testified that he had been dealing in aluminum since 1920, first as a purchasing agent for Edward F. Caldwell & Co. where he bought both wire and rod from Alcoa and various distributors. He had been employed subsequently as purchasing agent, production manager, or salesman for various concerns dealing in all commercial forms of aluminum. He recognized the merchandise represented by exhibits 1 and 3 as rods and stated that in his experience the line of demarcation between wire and rod was that wire is generally in coils while rod is something that is in straight lengths. He also stated that, when he was associated with E. F. Caldwell, he purchased rods from Alcoa in $\frac{1}{4}$-inch cross-sections or diameters.

Although the testimony of these witnesses is advisory only in its nature, we believe it clearly supports our view that the merchandise represented by exhibit 1 is in fact and in law properly classifiable as rods.

Defendant endeavored to overcome the effect of plaintiff's case by the introduction of evidence designed to prove that the terms "wire" and "rods" had a restricted commercial meaning different from the meaning popularly ascribed to those terms.

Twenty-five years ago our appellate court in *Jas. Akeroyd & Co. et al. v. United States*, 15 Ct. Cust. Appls. 440, T. D. 42641, gave expression to the following statement which is equally true today:

Commercial designation is a thing often claimed in customs litigation and rarely established.

As a matter of fact, it is increasingly difficult today for the reason that litigants are operating under a tariff statute which was enacted nearly 23 years ago, and with the passage of time it places a considerable burden upon the litigants to obtain evidence to establish a uniform, definite, and general designation of an article prior to June 17, 1930, when the present tariff act became law.

Further, the court said in the *Akeroyd* case—

* * * The rule of commercial designation was never intended, as has been often said, to apply to cases where some portion of the trade use a certain trade practice or nomenclature, but was intended to apply to cases where the trade designation is so universal and well understood that the Congress, and all the trade, are supposed to have been fully acquainted with the practice at the time the law was enacted. There was never any other reason for the rule.

In the light of the principles enunciated in the opinion above quoted, we approach an analysis of the testimony of the two witnesses introduced by defendant in an effort to establish that the terms "wire" and "rods" have a uniform, definite, and general meaning in trade and commerce different from that applied to those terms in common speech.

John Kradenski, who had been associated with the Aluminum Co. of America for 28 years, testified that for the past 20 years he had been employed either as administrative sales manager or assistant administrative sales manager, and that in June 1930, Alcoa was the only company he knew of which was engaged in the manufacture and sale of aluminum wire throughout the United States. When asked to define the term "aluminum wire," he stated—

Alcoa's determination of aluminum wire is any material or metal under ⅜" thick. That constitutes wire. It doesn't make any difference whether it is straight, coiled, round or rectangle shaped, the definite break is ⅜", anything under that is classified by Alcoa as wire.

According to this witness merchandise like exhibit 1, the imported commodity, was known as aluminum wire "Because it is under ⅜"." With respect to exhibit 3, he stated that any of the items which measure ⅜ inch or under would be aluminum wire and above that would be aluminum rod. Exhibit 4–A he identified as wire and exhibit 4–B as flattened wire.

Kradenski testified that prior to 1932 he was known as an "administrative administrator" and that, while it was his responsibility to screen all orders that came into the office, he did no direct selling prior to 1932.

When asked if he had ever heard of material like exhibit 1 being described as rod, he admitted that he had "but that is not Alcoa's determination."

It also appears from the testimony of Kradenski that in his opinion the reason why Alcoa drew the distinction between wire and rod at

⅜-inch diameter "was an arbitrary setup to create some breaking point between rod and wire," and the witness was unable to say whether or not it was followed by companies other than Alcoa.

It is obvious that the testimony of Kradenski falls far short of establishing a commercial designation or meaning of the terms "wire" and "rods" which would meet the test laid down in the *Akeroyd* case quoted above.

The second and last witness called by defendant was Charles J. Beneke who described himself as a coordinator of manufacturing facilities, products, and markets of aluminum production of the Reynolds Metal Co. He explained his duties as follows:

> I feel qualified to set up a plant, engineer it and make all these products shown here and organize it and have done so. In the first place, I am a registered professional engineer. I have done production engineering on aluminum. I have set up plants to make this product [referring to exhibits 1, 2, 3, and 4].

It appears further that Beneke had been in the aluminum industry since 1930 having been associated with Alcoa prior to 1940 where he was production engineer in wire, rod, bar, and cable departments. As a production engineer, he defined aluminum wire as follows:

> Aluminum wire is any solid section whose cross-section, that is diameter or greatest dimension is less than ⅜". In other words, the cross-section may be round, it may be square, it may be hexagon [*sic*], octagon or rectangular. Solid sections.

When asked if the definition of aluminum wire was definite, general, and uniform in the aluminum industry throughout the United States in 1930, he replied—"*After* 1930 I can only speak of."

Beneke was asked if he had ever heard of material like exhibit 1 referred to as rod, and he answered—"Yes, by people not familiar with the practice in the trade."

The foregoing extensive recital fully demonstrates that there was utter and complete failure of proof on the part of defendant to establish a uniform, definite, and general meaning of the terms "wire" and "rods" under the familiar rules governing proof of commercial designation. Therefore, in this case, the popular use of words furnishes the rule for construction.

Drawing upon our own knowledge, aided by lexicographic authorities and the record, we find and hold that the imported commodity, represented by exhibit 1, is properly classifiable as aluminum rods as provided in paragraph 374 of the Tariff Act of 1930 (19 U. S. C. §1001, par. 374), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, and is dutiable at 3 cents per pound. That claim in the protest is sustained.

Judgment will issue accordingly.