(C.D. 2385)

ZANIN & SON, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided February 19, 1963)

*Brooks & Brooks* (*Thomas J. McKenna* of counsel) for the plaintiff.
*John W. Douglas*, Acting Assistant Attorney General (*Sheila N. Ziff*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: The above-enumerated protest is directed against the classification and assessment with duty of certain brass rods imported from West Germany. The merchandise in issue would appear to be limited to that covered by commercial invoice No. 97122, accompanying the entry herein and described as follows: "Brass rods, as per our improved die No. 10000 in fix lengths, weight per metre approx. 0,257 kg, 6' x ⅛″ x ¼″ x ¹⁄₁₆″ x ½″ = 1828,8 x 3,175 x 6,350 x 1,587 x 12,7 mm,."

Said merchandise was classified by the collector of customs as manufactured articles, not specially provided for, composed in chief value of brass, in paragraph 397 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 397), as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and duty was imposed therein at the rate of 20 per centum ad valorem.

It is the contention of plaintiff herein that the merchandise in issue should properly have been classified as brass rods in paragraph 381 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 381), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, for which duty at the rate of 2 cents per pound is provided.

A commission (plaintiff's exhibit 2) was issued to take the testimony abroad of Dr. Herbert Winter, technical manager and executive of the Vereinigte Deutsche Metallwerke A.G., shipper of the instant merchandise. A listing of the answers pursuant to said commission, arranged in *seriatim* form, was received in evidence as exhibit 2–A. It is disclosed by said exhibits that the articles in controversy were manufactured from a special brass alloy, containing 53–54 per centum copper, 1.3–1.9 per centum lead, 0.3–0.5 per centum aluminum, 0.1–0.3 per centum manganese, with zinc constituting the remainder. The process of manufacture of the instant merchandise was described by Dr. Winter as follows:

* * * The analytical composition mentioned under #5 [set forth in percentage form above] is (formed) by melting in an electrical induction furnace appropriate intermediate materials, scrap and new metals and is poured into round billets having a diameter of 120 mm. The billets are sawed into sections (of fixed lengths), heated to a temperature of 700°C [approximate] and are forced through an extrusion press and are then extruded to the desired cross-section. The cross-section of the extruded material is profiled by the insertion of a die in the tool holder of the extrusion press. The crude pressed products were straightened and sawed to the required length.

A sample of the merchandise, except for length, was received in evidence as plaintiff's exhibit 1.

Joseph L. Zanin, president and treasurer of the plaintiff importer, testified that he had ordered the material in issue and, after delivery, had checked it to see that it met the purchase specifications. When asked to describe the processing the merchandise was subjected to after importation, the witness stated that a strip of either zinc or steel from three-quarters of an inch to 1 and one-quarter of an inch in width is attached to the lighter portion of the brass strips by drilling holes in both articles and eyeletting them together. An article representative of the finished product was received in evidence as plaintiff's illustrative exhibit 3. Zanin explained that the completed article is sold to terrazzo contractors who imbed it in a concrete underbed, which is brought to within three-quarters of an inch of the finished floor

surface. Marble chips and cement are then troweled in and ground to a finished terrazzo floor, leaving as an exposed edge the thickest portion of the processed brass strip.

On cross-examination, Zanin testified that he had bought merchandise such as exhibit 1 from domestic manufacturers, but that he did not buy it as "profiles" or as "shapes."

Clarence Lockwood, sales representative with the Anaconda American Brass Co., with which company he has been associated for a total of 37 years, was called to testify on behalf of the defendant. As sales representative, he sells the products his company produces and also is engaged in servicing any of said products in their applications or installations. When asked to explain his understanding of a brass rod, he stated that the term applies to a plain profile, such as a round, or a square, or rectangle, a hexagon, or an octagon, and, in some instances, a half-round, or half-oval, or full-oval. He stated his company had manufactured an article similar to exhibit 1 and that said article would not be classified as a rod, but as an extruded shape or section, adding that is how the article is bought and sold in the trade. It is never called a rod, would be classified as a profile shape, and would be listed and sold under the category of extruded shapes. His company has produced articles similar to exhibit 1 at various times since World War II, but the article is not in steady production, and he was not prepared to estimate the volume of sales of such articles for the past 10 years, or even for the past year.

Whether or not it was the defendant's intention, through the testimony of its witness Lockwood, to establish a commercial meaning for the term "rods" different from its established common meaning, is not clear. If such were the intent and purpose of Lockwood's testimony, we are of the opinion that it falls short of the requirement of establishing a general, definite, and uniform commercial meaning different from the common meaning. *Nylos Trading Company* v. *United States*, 37 CCPA 71, C.A.D. 422.

As a precedent for the relief sought in the instant case, plaintiff relies on the case of *John V. Carr & Son, Inc.* v. *United States*, 33 Cust. Ct. 286, C.D. 1666, wherein was presented a similar competition between the provision for articles, not specially provided for, in chief value of brass, in paragraph 397 of the Tariff Act of 1930, as opposed to the *eo nomine* provision for brass rods or bars in paragraph 381 of said act. In the *Carr* case, *supra*, slender, straight, and solid pieces of brass, imported in lengths of 7 feet or 12 feet in a variety of shapes in cross-section, including one with a rectangular base, nine-sixteenths of an inch by 1 and one-sixth of an inch, with raised rectangular section, three-eighths of an inch by three-eighths of an inch, which were produced by the process of extrusion and drawing and, after importation, were used in the fabrication of automotive fittings of vari-

ous shapes and sizes, were held to come within the common meaning of the word "rods" or "bars" and, accordingly, were encompassed by the *eo nomine* provisions of the claimed paragraph 381.

We are of the opinion that the reasoning applied in the *Carr* case, *supra*, applies with equal force and effect in the present fact situation and, as in the *Carr* case, so too here, we are of the opinion that no distinction should be drawn for classification purposes between brass rods of regular shapes and those of irregular profiles when, in fact, their manner of production is the same.

In the brief of defendant, the following statements appear—

* * * As Dr. Winter described the various manufacturing steps in his response to Interrogatory No. 6, billets were sawed into sections of fixed lengths, heated, forced through an extrusion press and then extruded to the desired cross-section. It will not be denied that at this stage of manufacture the merchandise extruded was a "rod" within the meaning of paragraph 381. However, Dr. Winter went on to state that "The cross-section of the extruded material is *profiled by the insertion of a die in the tool holder of the extrusion press*." Following this, the products *"were straightened and sawed to the required length*." [Italics quoted.]

Thus, by virtue of the profiling, and the finishing operation of straightening and sawing to a specified length, the articles were advanced beyond the rod stage to the point where they had become a manufactured article dedicated to a particular use. When in the first or "rod" stage, the articles could have been applied to many uses, but the subsequent manufacturing operations created a new article dedicated to a single use.

Defendant's reference to a *subsequent* manufacturing process, by virtue of the profiling of the brass, may be a misapprehension of Dr. Winter's testimony as to the production of the instant merchandise. It is the view of the court that, when the brass billets were processed through the extrusion press, they were extruded through dies which were so formed as to provide the ultimately desired profile cross-section. The extrusion of the basic brass billets and the shaping of the material in the form of its imported profile cross-section constitute a simultaneous process and were not the result of successive manufacturing operations. In that condition, to quote the language of the defendant's brief, "It will not be denied that at this stage of manufacture the merchandise extruded was a 'rod' within the meaning of paragraph 381."

Moreover, we are of the opinion that the mere straightening of the extruded brass rods and sawing them into required 6-foot lengths did not constitute such an advancement beyond the rod stage as to remove them from the provisions of said paragraph 381 of the Tariff Act of 1930. In the *Carr* case, *supra*, the articles were none the less rods in the tariff sense, although cut after extrusion and prior to importation from 40- to 60-foot lengths into pieces measuring 7 to 12 feet.

The various cases cited by defendant in its brief have been given our consideration.

In the case of *John J. Coates Co. et al.* v. *United States*, 44 CCPA 97, C.A.D. 643, after reviewing a number of decisions, including several which are relied upon by the defendant in the instant case (*United States* v. *Agents for Kearfott Engineering Co.*, 21 CCPA 264, T.D. 46790; *United States* v. *Strauss & Buegeleisen*, 20 CCPA 378, T.D. 46184), our appellate court stated—

It is clear from the foregoing decisions that whether an article which, at one stage of its production, is appropriately classified under a particular designation, has been so altered by subsequent operations that the designation is no longer appropriate, is a question of fact depending on the circumstances of each individual case.

The record before us discloses that the merchandise with which we are here concerned upon importation was the product of extrusion through a profile die into the desired cross-section. It was straightened and sawn into 6-foot lengths. Since nothing more was done to the articles prior to importation, the question of alteration by subsequent operations is not involved. In their condition, as imported, the articles in issue come within the provision for brass "rods" in paragraph 381 of the Tariff Act of 1930, as modified, *supra*, as that term has been judicially construed in *Mohawk Iron & Steel Co.* v. *United States*, 30 Cust. Ct. 274, C.D. 1533; *John V. Carr & Son, Inc.* v. *United States*, *supra;* and *Pheoll Manufacturing Company* v. *United States*, 40 Cust. Ct. 223, C.D. 1987.

The claim in the protest to that effect is, therefore, sustained and judgment will be entered accordingly.