(C. D. 1615)

INTERNATIONAL BRASS & COPPER CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided May 13, 1954)

*John D. Rode* (*Ellsworth F. Qualey* of counsel) for the plaintiff.
*Warren E. Burger*, Assistant Attorney General (*Richard H. Welsh*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: The importation, described on the invoice as "Rough Annealed Copper Rod not fully finished but suitable for re-drawing. (In Coils)," was classified by the collector of customs as wire, not specially provided for, within the provisions of paragraph 316 (a) of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 316 (a)), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, and assessed with duty at the rate of 15 per centum ad valorem. A copper tax of 2 cents per pound pursuant to the provisions of section 3425 of the Internal Revenue Code (26 U. S. C.) was also imposed, but it is not in controversy here.

The plaintiff-importer claims that the importation consists of copper rods and, therefore, is properly dutiable as such at the rate of 1¼ cents per pound as provided in paragraph 381 of said act (19 U. S. C. § 1001, par. 381), as modified, *supra*.

The competing statutes, so far as pertinent here, read as follows:
Paragraph 316 (a), as modified:

All wire composed of iron, steel, or other metal, not specially provided for (except gold, silver, platinum, tungsten, or molybdenum), 15% ad val.

Paragraph 381, as modified:

Copper in rolls, rods, or sheets, 1¼¢ per lb.

The question for our determination is whether upon the record before us the merchandise should be considered for tariff purposes as rods or wire.

Four witnesses testified in this case, two for the plaintiff and two for the defendant. Plaintiff's first witness, Carl E. Alfaro, stated that he was president of the International Brass & Copper Co., Inc., plaintiff herein, which is the exclusive sales representative for export of five of the leading American companies producing brass and copper, said companies being the Scovill Manufacturing Co., Waterbury, Conn.; C. G. Hussey & Co., Division of the Copper Range Co., Pittsburgh, Pa.; the North American Smelting Co., Wilmington, Del.; the Riverside Metal Co., Riverside, N. J.; and the Electric Materials Co. of North East, Pa. These companies among them manufacture a full range of copper and brass. Alfaro testified that he has been connected with the International company or its predecessor since 1930.

A sample approximately 10 inches long was received in evidence as exhibit 1. It represents the imported merchandise except for length and the fact that it was imported in coils.

When asked what was the temper of the imported material, Alfaro answered, "Soft, not fully finished, suitable for redrawing. That is the technical description of the material as ordered by the purchaser."

Although Alfaro had never seen merchandise "such as" exhibit 1 produced in the United States, nor had he made purchases of it, he had, nevertheless, purchased copper sheets, finished copper wire, and copper tubing. He added that he had purchased material "similar to" exhibit 1 from the Scovill Manufacturing Co.; that he had purchased copper rod in the United States from the Electric Materials Co., the Revere Brass Co., Anaconda, and the American Brass Co.; also, that he had purchased copper wire in the United States from the Lionel Essex Co. As to the quantities purchased, he stated that it averaged 150 to 200 tons per year of copper rod and approximately 50 tons of wire annually.

He testified that exhibit 1 is used solely for redrawing purposes to make it into fine wires and that the merchandise in controversy was sold to the Hudson Wire Co. "It was ordered as they wanted it, exactly to their specifications which called for coiled rods, suitable for redrawing"; he had seen merchandise like exhibit 1 drawn in the United States and knew of no other uses for it. He further testified— "we had another customer who directed us to bring the material from abroad into this country and to deliver it to the Hudson Wire Company for their account," the other company being the Montgomery Co. of Windsor Locks, Conn., and that the merchandise was sold to that company "As coiled rod not fully finished but suitable for redrawing."

When asked to state the difference between copper wire and copper rod, Alfaro answered—

Copper wire has a definite finish for a definite purpose and has certain physical and chemical characteristics that have to be met for the specific use for which it is wanted.

\*       \*       \*       \*       \*       \*       \*

If wire is purchased for electrical conductivity or for electrical wiring or for illumination for instance it has to meet certain specifications in finish and texture and temper and electrical conductivity.

As to the distinction or difference between rod and wire, so far as temper is concerned, he stated that—"It varies, rod and wire can be known as almost equal tempers because there is spring wire which has a very hard temper to it and you can have also a very hard temper rod," adding that "temper" is a resistance to distortion. He also stated that it is possible to have copper rod and copper wire of the same diameter.

Alfaro gave his understanding of the term "rod" as follows:

All materials that will or rather, that are processed in cylindrical form—most extrusion material is rod; all rods regardless of what the ultimate use is begin as a coiled material at a plant, at a mill, and it changes into wire at some point in the process of manufacturing. The definition of rod is not very easy to make, because a rod can be a short piece, straight, very hard, can be absolutely straight by the straightening processes; it can be also spaghetti shape coils, various dimensions and various alloys.

Based upon his experience, Alfaro stated that he would not consider exhibit 1 as wire. He also explained that "There are certain materials that are manufactured as rods which are even thinner than some wires. It all depends in the end use of the product."

When asked if exhibit 1 is the product of extrusion from the billet in a semimolten state, the witness replied—

Yes, that is right, it can also be produced from the partial refinement in what is called \* \* \* a wire bar, which can then be rolled or redrawn.

.\*       \*       \*       \*       \*       \*       \*

It could be produced by the process of drawing.

The witness was asked why wire the diameter of exhibit 1 could not be produced by the extrusion process, to which he replied— "Because you couldn't, it requires temper, you couldn't get an extrusion material with temper."

Plaintiff's second witness, Charles J. Royle, testified that for about a year he had been associated with the Stamford Processing Co. at Stamford, Conn., engaged in the "Development, metallic redrawing, it is more or less experimental for the present"; that prior to that time and for a period of 43 years he had been vice president and general manager of the Hudson Wire Co. "and subsidiary," being "Wire manufacturers in one plant; screen cloth and wire mesh in another plant and magnetic wire in a third plant." In his long experience, he had become familiar with the manufacturing operations and the purchasing of raw materials which were processed by his

company, and he had purchased merchandise like exhibit 1 from the American Brass Co., Phelps Dodge, Rome Cable, Scovill, Chase, Anaconda, and International Brass Co. (plaintiff herein) as "copper rod."

Royle stated that he had seen an article like exhibit 1 produced, and described the processing of the commodity as follows:

This particular material was cleaned in acid, put through a continuous wire drawing machine, operated with carbide dies and redrawn to finer size. The particular wire that came from England was so hard in spots and several coils, it was necessary to anneal it before processing it.

Annealing was defined as "tempering the wire to a softness so that it can be redrawn." The witness stated that after drawing down material like exhibit 1 the product is called wire. In explaining the uses of such wire, he testified—"Well, you have the electrical field where they use it for radio, radar, telephone, sponges for scouring kitchen utensils, telephone wire, telegraph wire"; that he presumed there are some other uses for merchandise like exhibit 1 than for drawing down to finer sizes, but he could not recall any of such uses. When asked if it made any difference whether exhibit 1 was in coil form or not, he replied—

If it is for redrawing it must be in coil form because you must have continuous lengths. You could draw short lengths of straight material, but it would be impractical.

He described exhibit 1 as an unfinished product "in the respect that it had to be cleaned and free from oxide and discoloration before it could be redrawn."

On cross-examination, Royle testified with respect to exhibit 1 that—"We termed this rod, from 1922 until 1949" and that it was used "For redrawing into finer gauges"—"for the electrical field."

He stated that he had purchased products similar to exhibit 1 from Anaconda Copper company and from Phelps Dodge company; that whereas his company did not purchase any great quantity from Anaconda, it had purchased more than 5,000,000 pounds a year over the last 30 years from Phelps Dodge, and that he did not know under what name Phelps Dodge sold the material to his concern, but that his company termed it copper rod. Later, as a result of further interrogation by the court on this point, he stated that the merchandise was shipped to him as copper rods.

When asked by the court by what term merchandise similar to exhibit 1 was ordered from Phelps Dodge or from Anaconda Copper company, the witness replied—

Well, I—ever since 1922 at the time we change some machinery, we termed the material .1285 diameter copper, as copper wire rod, or copper rod, because our machines were manufactured to take care of that size.

When asked if merchandise like exhibit 1 could be used in its condition as imported without further redrawing, Royle replied—"It may have some application but at the moment I don't know of any."

On redirect examination, he stated that some of the brass mills have invoiced merchandise like exhibit 1 shipped to his company as wire but frequently it had been invoiced merely under a heading of "high brass" or "low brass" copper in so many coils.

Royle concluded his testimony by stating that generally speaking there are two processes for the production of rod—extrusion and rolling processes, the rolling processes being the "hot" as opposed to the "cold" rolling process—but that he could not tell from looking at exhibit 1 whether it was done one way or the other. He added that from his experience exhibit 1, in the condition as produced from a billet, has no further use except to be drawn into wire.

William K. Dunbar, Jr., who was called by the defendant, testified that he had held various positions with the Phelps Dodge Products Corp. since 1930, his duties being almost entirely of a sales nature. The business of Phelps Dodge includes the fabrication of copper products, the rolling of rods, and the drawing and insulating of wire. He also testified to his familiarity with the manufacturing processes of wire and rod at the Phelps Dodge mills; that he had been familiar with the production of merchandise like exhibit 1 "possibly since 1916 or 1917 and maybe earlier." In describing its manufacture, he stated—

This wire is produced originally from a wire bar and that wire bar is run through a furnace—

Q. * * * how large is the wire bar?—A. 200 to 225 pounds.

Q. What is the diameter?—A. They are probably about four inches, or five or six inches.

Q. How did that wire bar come into existence?—A. The wire bar is cast in the refinery and then delivered to the mill where the wire bar is heated in a furnace and then run through a rolling mill; it is run through rough rolls and finishing rolls and when it comes out what is termed "Hot rolled copper rod". That hot rolled copper rod is then taken from ¼″, ⁵⁄₁₆″, ⅞″ whatever it happens to be, and is drawn down from there on into wire and as a result this—

Q. And by "this" you mean Exhibit #1?—A. Yes, Exhibit #1, is apparently about what we would term a #8 solid, soft, drawn, bare copper wire.

In Dunbar's opinion, it would be commercially impracticable to produce merchandise like exhibit 1 by the extrusion method.

When asked under what name merchandise like exhibit 1 was sold by his concern, he replied—

#8 A. W. G. or B & S gauge, solid soft, bare copper wire either in coils or on reels.

In view of the foregoing unqualified statement of defendant's witness Dunbar, it is difficult to give full credence to the testimony of plaintiff's witness Royle. Although Royle's concern had made purchases of more than 5,000,000 pounds a year of similar merchandise over a period of 30 years from the Phelps Dodge Co., he did not know under what name the merchandise was sold, but on being pressed for an answer, testified that this company shipped it as "copper rods."

Continuing his testimony, Dunbar stated, as a result of years of experience in the wire and cable industry, that—

The principal use for this particular piece of soft wire would be to an insulater [sic] of wire who would take and draw it down into smaller size, strand it up into cables, cover it with various insulating compound, or take this and draw it down for use in various mechanical processes, such as brake-lining wire; screen cloth; tinsel wire; various types of material of that sort. Also, that wire in its present form could be used as tie-wire which is used to tie a telephone wire to a porcelain or glass insulator or to a bare telegraph cable to an insulator, across the top or side of the insulator. We have sold great quantities for that particular use.

Dunbar drew the distinction between wire and rod as follows:

A wire is fabricated by the process of drawing; a rod is rolled; there is a distinct difference between a rod and a wire; they are not comparable; they are two different things.

He stated that a rod and a wire might be of the same diameter and that the distinction between wire and rod had been recognized by him through his commercial experience of about 18 years.

On cross-examination, Dunbar was asked to explain to what extent merchandise like exhibit 1 was used to tie transmission wires to insulators, and he replied—

It is used a great deal in that way by the Western Electric Company, the Bell System. They use many hundreds of thousands of pounds of wire very similar to that, soft, annealed, cut to length, suitable for a lineman to tie the line around the insulator and fasten the telephone wire around the insulator; it is also used by utility companies.

For that purpose, it is sold either in coils or in lengths of 22 inches.

When asked what was the chief use of merchandise like exhibit 1, the witness replied—

For radio work in smaller sizes or used in the present size and insulating the wire with the various types of insulating material, such as rubber, or neoprene or polyethylene, whatever the particular use happened to be.

In his opinion, the imported merchandise "is clean," which it must be for the purposes indicated.

Although Dunbar had testified that rod is processed by rolling, and wire by drawing, he admitted that rod may be obtained by drawing also. He conceded that normally the term "rod" is applied to articles which require further manufacturing processes.

291

Defendant's second witness, Dante Mancini, testified that he had been employed by the Anaconda Wire & Cable Co. in supervisory and managerial positions for some 8 or 9 years; that he presently is the coordinator of the mills sales office; that the business of Anaconda is the manufacture of electric wire and cable; and that he is familiar with the method used by his company in manufacturing merchandise like exhibit 1, which he described in detail.

When asked at what point the product becomes rod and when it becomes wire, the witness replied—

It was always clearly understood in our organization that the hot rolling process gave us rod and the cold rolling process gave us wire.

Q.   At what dimension would the material have reached when the hot rolling process ceased?—A.   The smallest dimension was one-quarter inch, but you can roll a rod ¾'' in order to have a wire that would be one-half inch in diameter but that is cold rolling through a die.

Mancini stated that since 1948 his company had sold merchandise like exhibit 1 as wire, and that to his knowledge such merchandise was never sold by it as rod.

Although the witness was asked various questions about the sales of his company, it appears, as above stated, that his sales experience did not extend back of 1948 but that he "had to make studies of sales statistics dating back to 1930 and 1931." He stated, however, that within his experience, merchandise identical with exhibit 1 had been sold to the Hudson Wire Co. under the designation of ".1285 soft, bare, copper wire."

Mancini testified that the only use of a rod which is produced from a bar would be for redrawing purposes.

On cross-examination, Mancini testified that the Anaconda company does not roll copper rod less than one-fourth inch in diameter.   In his opinion, exhibit 1 was "produced by cold drawing in order to get the burnished appearance, you can only get that by cold drawing," and that it is a finished wire.

Mancini also testified that he had personally never made a sale of merchandise like exhibit 1, neither had he purchased any.   When asked if copper rod can be obtained by drawing, the witness replied—"Copper rod in the wire form which I am acquainted with can not be obtained by drawing."

When interrogated as to the use of merchandise like exhibit 1, the witness replied:

In the first place in our own mill when we use this for redrawing, we also have break-down sizes.

X Q.   Where else have you observed it?—A.   I have observed it used as tie-wire in insulators by the Westchester Lighting Company.

*       *       *       *       *       *       *

X Q.  And the only uses you have seen it used for is for redrawing and as tiewires?—A.  Yes, of course, I have also seen it covered with insulating materials, that is in our own mill.

It is not contended by either of the parties to this litigation that the case is governed by the rule of commercial designation, and the foregoing analysis of the record clearly indicates that it fails to establish a commercial meaning of the terms "rods" and "wire" different from their common meaning.  Consequently, we approach this case upon the principle that "tariff acts are drafted * * * in the language of commerce, which is presumptively that in common use." *Meyer & Lange et al.* v. *United States*, 6 Ct. Cust. Appls. 181, T. D. 35436.

From the record before us, it is not an easy matter to distinguish between what constitutes rods and what constitutes wire.  In the language of plaintiff's witness Alfaro "It all depends in the end use of the product."  However, as was stated in the *Swedish* case (T. D. 35100), *infra*, "the destined use of an article does not control its classification unless the statute distinctly prescribes it," and neither provision of the tariff act before us is a use provision.

In ascertaining the meaning of the terms "wire" and "rods," as employed by Congress in paragraphs 316 and 381, *supra*, the court's understanding of those terms is aided by reference to recognized lexicographic and scientific authorities and by the advisory quality of the testimony of experienced witnesses.

In support of its contention that the imported commodity, represented by exhibit 1, is within the common understanding of the term "wire rod," plaintiff invites our attention to Webster's New International Dictionary, 1943 edition, which defines "wire rod" as "A metal rod from which wire is drawn" and to Funk & Wagnalls New Standard Dictionary of the English Language, 1942 edition, in which the following definitions of wire rod appear:

1.  A billet of iron or steel after it has been passed through the rolling-mill and been reduced in size preparatory to drawing.  2.  Any metal rod of small diameter.

Reference is also made in plaintiff's brief to a publication of the American Society for Testing Materials, "Standards on Copper and Copper Alloys," February 1952 edition, page 350, Appendix III, under the heading of "Definition of Fabricators' Copper Products," wherein the following appears:

Rod.—A round, hexagonal or octagonal solid section.  Round rod for further processing into wire (known as "hot-rolled rod," "wire-rod," or "redraw wire") is furnished coiled.  Rod for other uses is furnished in straight lengths.

In its brief, defendant, in support of the contention that the merchandise in controversy is, in fact, wire, as that term is used in paragraph 316, *supra*, cites the following definitions:

Funk & Wagnalls New Standard Dictionary of the English Language, 1942 edition:

wire, *n.* 1. A slender rod, strand, or thread of ductile metal, now usually formed by drawing through dies or holes, but formerly made by hammering.

Wire varies in diameter from 1 inch to 1/7000 of an inch or less, but ordinarily when thicker than 3/16 of an inch it is termed a *rod*. In making iron and steel wire, a billet of metal is passed through the rolls in a rod mill until reduced to the desired size of rod. This rod is thoroughly cleaned and scaled, usually by dipping in diluted sulfuric acid and then *threshed*, after which it is pointed on one end so that the wire-drawer may be able to grasp it with his tongs as he starts it through the plate or die. It is then run through the dies and reduced one or more sizes in diameter. If further reduction is desired, it requires to be annealed, when the drawing may be repeated through a series of smaller dies. * * *

Webster's New International Dictionary, 1948 edition:

wire, *n.* * * * 1. Metal in the form of a thread or slender rod usually very flexible, and circular in cross section; * * *.

From the foregoing lexicographic authorities, coupled with the description of the merchandise given by the witnesses for the respective parties, and a visual examination of the imported commodity, represented by exhibit 1, it would appear that the article in issue possesses that degree of flexibility, pliability, and fineness, which is characteristic of wire rather than of rod.

It is argued by plaintiff in its brief that "the merchandise as imported is unfinished; that it is suitable because of its condition when imported only for further manufacture and is not a finished product * * *. As material for further manufacture it should not be classified under Paragraph 316 which generally provides for articles which are to be used in the condition in which imported."

In support of this contention, plaintiff invites our attention to the fact that paragraph 315 of the Tariff Act of 1930 provides specifically for "wire rods" of iron or steel which, it claims, "is the terminology used to describe material imported to be drawn into finer sizes," citing *Swedish Iron & Steel Corporation* v. *United States*, 6 Ct. Cust. Appls. 225, T. D. 35466. It is admitted by plaintiff that the wire rods there described were limited to rods of iron or steel and "wire rods of other material are not provided for therein."

In the cited case, our appellate court affirmed the judgment of this court in the same case, 28 Treas. Dec. 101, T. D. 35100, from which it appears that the merchandise there in controversy consisted of round iron rods from 60 to 100 feet in length, which, according to the testimony of a member of the importing corporation, were used for

making chains, clevises, and chain pins, and that he had no knowledge of any of it being used for wire drawing. It was the testimony of other witnesses that, to use the imported material for wire drawing, it would be necessary to subject the merchandise to preparatory processes. After reviewing the evidence in that case, we said—

As it is clearly established by the testimony of the witnesses for the importers that said merchandise consists of wire rods suitable for use in making wire and rivets, it is unquestionably dutiable as such, even though it is capable of being employed in the manufacture of other articles as well. The statutory provision is for wire rods of iron or steel, and it is wholly immaterial to what purpose or use the same may be employed. As was said *In re* Herman Boker & Co., G. A. 6694 (T. D. 28625), the destined use of an article does not control its classification unless the statute distinctly prescribes it, but if they are bought and sold under the name or have the necessary qualities and characteristics, they are dutiable as such; citing Jessup *v.* Cooper (46 Fed., 186) and Goodwin *v.* United States (66 Fed., 739).

From the reasoning in the *Swedish Iron* case, *supra,* wherein the court apparently regarded the provision there involved as one relating to *material* rather than finished articles made therefrom, plaintiff seeks to draw an analogy for classification of the instant merchandise within the provisions of paragraph 381, as modified, *supra,* contending that it encompasses copper rolls, rods, or sheets, as materials or semimanufactures to be further processed, and urging that the importation here involved comes within its scope.

This contention is untenable, however, in view of the contradictory record before us, the further fact that plaintiff has not satisfactorily overcome the presumptively correct classification of the merchandise as wire, and for the reason that the record discloses that the merchandise, as imported, although concededly not dedicated solely for that purpose, is used in substantial quantities by linemen in fastening transmission wires to insulators, which is clearly a "wire" use and is confirmatory of the collector's classification.

Plaintiff in its brief also refers to the cases of *Driver-Harris Wire Company* v. *United States,* 16 Treas. Dec. 223, T. D. 29296, and *Driver-Harris Co.* v. *United States,* 51 Treas. Dec. 1113, Abstract 2194.

In the first of the *Driver-Harris* cases referred to, the merchandise consisted of hot-rolled wire rods or bars composed of an alloy of copper and phosphor tin, imported in coils about 100 feet in length, and used solely as raw material for making wire by drawing into dies. The question there presented was whether the importation was dutiable as copper rods, as classified by the collector, or, *inter alia,* encompassed by a provision for "composition metal of which copper is a component material of chief value not specially provided for in this Act." The court, in holding in favor of the plaintiff on the latter claim, was not confronted with the competition of the tariff provisions here in issue and, therefore, that case is not controlling of the question presently before us.

The latter-cited *Driver-Harris* case likewise appears to have no bearing on the present controversy.

After a full consideration of the record presented, the cases cited by the parties in their briefs, a visual examination of the imported merchandise represented by exhibit 1, which is a potent witness, and resort to lexicographic authorities, we are of the opinion, and so hold, that the weight of evidence supports the classification of the subject merchandise as wire within the provisions of paragraph 316 (a), as modified, *supra.* The claim in the protest is, therefore, overruled.

Judgment will be entered accordingly.