## (C.D. 2138)

SCOVILLE MANUFACTURING Co., A. SCHRADER'S SON DIVISION *v.* UNITED STATES

United States Customs Court, Second Division

(Decided December 10, 1959)

*Brooks & Brooks* (*J. Joseph McDermott* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Henry J. O'Neill* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: An importation, consisting of 541 coils of merchandise, described on the invoice as "Round Brass Rod," was classified by the collector of customs as "wire composed of * * * metal, nspf.," and duty was imposed thereon at the rate of 12½ per centum ad valorem pursuant to paragraph 316(a) of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 316(a)), as modified by the Torquay

Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739. The collector cited our decision in *International Brass & Copper Co., Inc.* v. *United States*, 32 Cust. Ct. 284, C.D. 1615, as authority for his action.

The plaintiff claims that the merchandise is properly classifiable as "Brass rods," which are provided for in paragraph 381 of said act (19 U.S.C. § 1001, par. 381), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, and accordingly dutiable at the rate of 2 cents per pound.

The pertinent text of the statutes under consideration reads as follows:

Paragraph 316 (a), as modified:

Wire composed of iron, steel or other metal, not specially provided for (except gold, silver, platinum, tungsten, or molybdenum) _____ 12½% ad val.

Paragraph 381, as modified:

Brass rods, sheet brass, brass plates, bars, and strips, Muntz or yellow metal sheets, sheathing, bolts, piston rods, and shafting_____ 2¢ per lb.

At the trial, seven witnesses were called, all of whom testified on behalf of the plaintiff.

John Strianse testified that for 8 years he had been traffic zone manager for A. Schrader Son, Division of Scoville Manufacturing Co., a concern engaged in the manufacture of time valves, air control products, and related articles which are sold in all parts of the United States.

Strianse identified the importation in controversy as consisting of one size 0.365 round brass rod and another as 0.436 round brass rod, samples of which were received in evidence as exhibits 1 and 2, respectively. The sizes referred to were in terms of diameter. The exhibits represent the subject merchandise in all respects, except as to length and the fact that the commodity was imported in coils in lengths of 150 feet or more.

G. S. Mallett testified that he was technical supervisor of the Anaconda American Brass, Ltd., of New Toronto, Ontario, Canada. This firm is engaged in the production of copper and copper alloys which are made into the form of sheet, strip, wire, tube, and so forth. Mallett identified exhibit 3 as a photostatic copy of the order placed by the importer-plaintiff with the Anaconda Co.

As a metallurgist with a technical background and having general supervision of the company laboratory, Mallett testified that analyses of the importations in issue showed approximately the following contents:

| | | |
|---|---|---|
| Copper | 62 | percent |
| Zinc | 36.25 | percent |
| Lead | 1.75 | percent |

(This evidence is important in considering the testimony relating to commercial designation, which will be discussed, *infra.*)

It was Mallett's testimony that the merchandise showed traces of iron which were infinitesimal. He explained that lead was deliberately added "for the purpose of making it possible to easily machine the alloy. For example, if you want to cut rods or you want to drill holes in the—in it, the lead actually occurs in the form of small particles between the crystals of the copper, zinc material and makes it, shall we say, short, so that it breaks off easily; ends the edge of the cutting tools." He further testified as follows:

JUDGE FORD: It is also true in copper wire?

THE WITNESS: There is no lead in copper wire.

JUDGE FORD: Brass?

THE WITNESS: We add lead to a number of the brass alloys. This is only one of the many alloys that we produce; the material of this particular composition.

Mallett stated that the imported merchandise was produced pursuant to specification 37–B supplied by the plaintiff company. The specification was received in evidence as exhibit 4, with the limitation imposed by Government counsel that it should not be bound by the statement on the certificate characterizing the merchandise as brass rods.

The witness testified to the method of producing merchandise of the two sizes in controversy as follows:

Taking the .365 inch as an example, we would first have all melt and cast the alloy in the form of billets which would be cylinders, approximately 7 inches in diameter and they would be cut into 24 inch lengths. Those billets are heated and placed in a hydraulic press. A steel die is placed in front and a ram comes up from behind which extrudes the plastic metal through the holes in the steel die at a diameter of, in the case of .365 rod, a diameter of .437 inches. The rod is immediately coiled. That is to say, wound up in a coil for convenience in handling.

He also stated:

JUDGE LAWRENCE: At that time, it is what?

THE WITNESS: .346. It was 7 inches before extruded to the other figure.

The product is then coiled and "one end of the rod is swedged [*sic*] down" to a point which is inserted into a steel die of a smaller size and drawn through it to reduce a diameter in one operation to 0.365.

As stated by the witness, "* * * it so happens by coincidence that the extrusion size for the .365 is within a thousandth of an inch with the normal size of the other." It appears that the extrusion operation is conducted at a temperature of around 800 degrees centigrade, whereas the drawing operation is conducted at a "natural" temperature. Following the cold drawing operation, the product is annealed to meet with tensile strengths and other physical requirements. In

this process, the metal is passed through a furnace where it is heated for a time at a "suitable" temperature. Following the annealing, "there are the usual supplemental operations of pickling or cleaning the rod and inspection, testing, and preparing for shipment."

To produce material with the diameter of 0.365 of an inch, the extrusion stock would have a diameter of 0.437 while in the case of the size 0.436, the extrusion stock would be 0.522 of an inch. Both sizes are produced in coiled form from the extrusion machine. On many occasions, however, the material is cut to straight lengths depending "on the order and customer's requirement," and the material is usually sold by the pound.

It was Mallett's testimony that his company had been making products like exhibits 1 and 2, and having the same approximate composition, some 25 years.

On cross-examination, the witness stated that if his firm had an order for brass rods or brass wire in straight lengths of 24 feet, the manufacturing operation would be identical to that above described for both, except that "the very last thing we would do would be [*sic*] the coil through the straightening machine * * *. We would either ship it in coils or cut it up in straight lengths depending on what the customers ask for."

Mallett's testimony was related to his commercial experience in Canada.

The subsequent testimony was directed, for the most part, to the commercial designation of the imported commodity.

Harry E. Gordon testified that he had been associated with the Chase Brass & Copper Co. of Waterbury, Conn., having 26 offices in the United States and was engaged in the manufacture of copper and brass in the form of brass rod, wire, sheet, and tubing, which are sold throughout the United States.

He first became associated with the Chase Co. "in the mill portion" in 1917, and, since 1924, in the sales department.

His firm manufactures brass products similar in composition to exhibits 1 and 2, and he had been actually selling such merchandise since 1928. He stated that the area of the United States in which he had sold such products was "By contact, east of Chicago, by correspondence and telephone calls all over the country." As a matter of fact, he further stated that his firm sells material in every state in the United States, including both "territories of Puerto Rico and —" in wholesale quantities under the trade name of brass rod, a trade designation which was definite, uniform, and general throughout the United States prior to 1930, and that he had never known merchandise represented by exhibits 1 and 2 as brass wire. An alloy composition such as exhibits 1 and 2, if the diameter is over 0.0907, is known as a rod. A brass alloy of a diameter of less than 0.0907 is known as wire.

Brass products of the composition of exhibits 1 and 2 were known throughout the trade in the United States about 1930 as brass rods, whether they are furnished in coils or in straight lengths. Gordon further testified that merchandise of the composition of exhibits 1 and 2 is not made into brass wire.

After much discussion, it was finally developed through Gordon's testimony that, prior to 1930, catalogs of his company listed merchandise such as exhibits 1 and 2 for sale as brass rods, and that, since 1930, catalogs of that company had listed such merchandise as brass rods, without giving any specifications of their contents, being listed "as free cutting brass rod."

The uses of the merchandise such as exhibits 1 and 2 are the same today as prior to 1930, namely, for "making valve stems and also for tire valves." Such merchandise was not made into wire because of the presence of lead.

Chauncey P. Goss testified that he is vice president and manager of the mill products division of the plaintiff company, had been associated with it since 1928, and that his company manufactures merchandise like exhibits 1 and 2. He began his duties with the sales department of his company in 1928 and continued in that capacity until 1956. He further stated that he sold the merchandise similar to exhibits 1 and 2 in the States of New York, Michigan, Illinois, Pennsylvania, and Ohio.

It was then stipulated that the testimony of this witness would be the same in all material respects as the testimony given by the witness Gordon.

Raymond P. Winberg of Revere Copper & Brass, Inc., in New York City, with offices and some 16 plants throughout the United States from California to the east coast and from the Canadian border to Mexico, testified that his company manufactures a full line of so-called brass milled products, which include brass rods and brass wire. Both of these commodities are sold in wholesale quantities throughout the United States.

In 1928, Winberg was assistant sales manager of the Rome Brass & Copper Co. which later became one of the divisions of Revere Copper & Brass. Prior thereto and since 1920, he was employed by the Mueller Brass Co. as a salesman. Since 1920 to the present time, the witness had been engaged in buying and selling brass rods and brass wire in wholesale quantities throughout the United States.

During his experience of 37 years, merchandise having the composition and structure of exhibits 1 and 2 had been designated in the wholesale trade of the United States as brass rods. The witness had never heard or known articles of merchandise having the diameter and composition of exhibits 1 and 2 being bought or sold as wire.

When asked by the court what is the distinction between brass rods and brass wire, the witness stated, "Well, normally we think of wire

in the higher non-leaded alloys, and they are priced and considered as wire, and it gets back again to the composition, whether we in pricing and in our terminology class it as wire or as rod. * * * that anything under what is about .0907-gauge is considered as wire. Now, there is a contradiction, which has been brought out here, that because of alloy change within that range of diameter, by virtue of the alloy, and there we get to the method of manufacture, the non-leaded material would be considered as wire." In order for the trade to distinguish between a brass rod and brass wire, it must know not only the diameters but the composition of the wire.

Brass rods may be either in coils or in straight lengths and the same is true of brass wire. The presence of lead gives the product a "free-turning" or "easy cutting" quality.

Leaman S. Broughton testified in substance that he was production control manager of A. Schrader's Son Division of the plaintiff company and had been associated with that concern 38 years.

His duties, during the past 10 years, were to order all raw materials and put them into finished production. Fifteen years prior thereto, he was raw stores manager and previous to that "worked in the plant."

He had been familiar with the merchandise represented by exhibits 1 and 2 for 38 years and stated that merchandise such as exhibit 1 was used to manufacture bus, airplane, and truck tire valves. Illustrative exhibit 7 was received in evidence to indicate how merchandise like exhibits 1 and 2 is processed into its final status as tire valves.

Broughton does all of the ordering of merchandise such as exhibits 1 and 2 and has always known it as round brass rods in coils but never as wire.

Maurice Liston, Jr., who was the last witness called to testify on behalf of plaintiff, stated that he was assistant vice president of Scoville Manufacturing Co. since 1946 and that his duties involved various angles of sales work, such as sales planning, sales administration, market research, pricing, and so forth. Prior thereto, from 1939 to 1946, he had been associated with said company in various capacities having to do with production, production control, cost work, and industrial engineering. He stated that his firm manufactured and sold articles like exhibits 1 and 2 all over the United States.

The plaintiff's case rests upon the contention that merchandise, having the chemical and physical characteristics and uses represented by exhibits 1 and 2, is of the class or kind of merchandise which was commercially designated, bought, and sold in the wholesale trade of the United States prior to June 17, 1930, as brass rods.

In our consideration of this claim, we have the testimony of Witness Mallett, a metallurgist having supervision of the laboratory of the concern in New Toronto, Ontario, Canada, which manufactured

the subject merchandise, who testified to its composition and the method of its production.

With this background, we have the testimony of Harry E. Gordon, who had a commercial experience dealing in merchandise like exhibits 1 and 2 since 1928 in wholesale quantities throughout the United States. He stated that the commodity was sold under the trade name of brass rod, a designation which was definite, uniform, and general throughout the United States prior to 1930; that he had never known such merchandise to be billed as brass wire.

Chauncey P. Goss, whose testimony is reviewed, *supra*, testified that, since 1928, he had sold merchandise similar to exhibits 1 and 2, which his concern manufactured, throughout the States of New York, Michigan, Illinois, Pennsylvania, and Ohio, and it was stipulated that his testimony would be the same, in all material respects, as that given by the witness Gordon.

Raymond P. Winberg testified that, since 1920, he had been buying and selling in wholesale quantities throughout the United States brass wire and brass rods having the composition and structure of exhibits 1 and 2 and that such merchandise had been designated in the wholesale trade as brass rods. He had never heard or known of such merchandise being bought and sold as wire. That anything below approximately 0.0907 gauge is considered wire. In order to differentiate between brass rod and brass wire, it is necessary to know the diameter and the composition of the product. Brass wire does not contain lead, whereas in the case of merchandise such as exhibits 1 and 2 it is deliberately added to give the product a "free-turning" or "easy cutting" quality.

The qualifications of the witnesses introduced by plaintiff are unchallenged and their testimony is not refuted. We have the evidence of three exceptionally well-qualified trade witnesses who were experienced in buying or selling merchandise having the chemical and physical properties of exhibits 1 and 2 at wholesale throughout the entire United States under the trade or commercial designation of brass rods, a term by which the commodity was definitely, uniformly, and generally designated.

The purpose of the foregoing trade testimony was to establish a commercial meaning of the term "brass rods" differing from the common meaning.

In plaintiff's brief, our attention is invited to definitions of the word "rod" appearing in Webster's New International Dictionary (1930) and Funk & Wagnalls New Standard Dictionary of the English Language (1942), which indicate that a rod is "A straight and slender stick; * * * any slender bar, as of wood or metal" (Webster's) and "a straight, slim piece of wood or other material" (Funk

& Wagnalls), thereby indicating a common meaning of the term "brass rods" differing from its commercial meaning.

It is our considered opinion that the testimony of Gordon, Goss, and Winberg, which stands uncontradicted, establishes that, at and prior to the passage of the Tariff Act of June 17, 1930, merchandise having the character, chemical, and physical properties and uses of merchandise such as exhibits 1 and 2 was uniformly, definitely, and generally known in the trade of the United States as brass rods, whether in coils or straight lengths. *Stephen Rug Mills* v. *United States*, 32 C.C.P.A. (Customs) 110, C.A.D. 293, and cases cited therein.

The case of *International Brass & Copper Co., Inc., supra*, relied upon by the collector as the basis of his action, is clearly distinguishable.

The commodity in that case is described in the opinion as "Rough Annealed Copper Rod not fully finished but suitable for re-drawing. (In Coils)." It further appears that some of the merchandise there under consideration was, after importation, processed for use in wire drawing, while a substantial quantity was used in the condition as imported to fasten transmission lines to insulators.

In the case now before us, the evidence discloses that, by reason of the presence of lead, which was deliberately added to the subject merchandise, it could not be used for wire drawing.

Moreover, the fact of commercial designation was established in the instant case and was not proven in the *International Brass* case, *supra*.

Based on the record and for the reasons above set forth, we find and hold that the subject merchandise was, at and prior to June 17, 1930, bought and sold in wholesale quantities and was uniformly, generally, and definitely known throughout the trade in the United States as brass rods. The claim in the protest that said merchandise is properly dutiable at 2 cents per pound as provided in paragraph 381, as modified, *supra*, is sustained.

Judgment will issue accordingly.