(C.D. 4287)

BROWNING METALS CORP. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided October 21, 1971)

*Barnes, Richardson & Colburn* (*Peter J. Fitch* of counsel) for the plaintiff. *L. Patrick Gray, III*, Assistant Attorney General (*Peter Jay Baskin*, trial attorney), for the defendant.

Before RICHARDSON and LANDIS, Judges, and ROSENSTEIN, Senior Judge

LANDIS, Judge: The merchandise in these two protests, some of which was imported from Belgium (1 entry), France (3 entries) and some from Mexico (1 entry) in 1964, is stipulated to consist of wrought brass metal products of solid cross section. Customs classified the products as brass shapes dutiable at 1.275 cents per pound plus 15 per centum ad valorem under TSUS (Tariff Schedules of the United States) item 612.82. Plaintiff claims the products should be classified as brass rods dutiable at 1.7 cents per pound on the copper content, plus 2 cents per pound, under TSUS item 612.62.[1]

Schedule 6, part 2, subpart C of TSUS, which classifies copper, its

---

[1] Plaintiff stated, of record, that it would not press the protest claim under TSUS item 612.39. We deem the claim to be abandoned.

alloys, and their so-called basic shapes and forms, in relevant context provides for brass rods and brass shapes as follows:

SCHEDULE 6.—METALS AND METAL PRODUCTS

Part 2. — Metals, Their Alloys, and Their Basic Shapes and Forms

Subpart C. — Copper

Subpart C headnotes:

\*      \*      \*      \*      \*      \*      \*

3. For the purposes of this subpart, the following terms have the meanings indicated:

\*      \*      \*      \*      \*      \*      \*

(c) Rods: Products of round, half-round, quarter-round, oval, half-oval, triangular, pentagonal, hexagonal, octagonal, or decagonal solid cross section, in straight lengths or in coils, and which if in coils is over 0.375 inch in maximum cross-sectional dimension.

\*      \*      \*      \*      \*      \*      \*

(e) Angles, shapes, and sections: Products which do not conform completely to the respective definitions set forth in this headnote for bars, plates, sheets, strip, rods, or wire, and do not include any tubular products.

\*      \*      \*      \*      \*      \*      \*

Wrought rods, of copper:

| | | |
|---|---|---|
| 612. 60 | Copper, other than alloys of copper_____ | \* \* \* |
| 612. 61 | Nickel silver_____ | \* \* \* |
| 612. 62 | Brass _____ | 1.7¢ per lb. on copper content + 2¢ per lb. |

\*      \*      \*      \*      \*      \*      \*

Angles, shapes and sections, all the foregoing which are wrought, of copper:

| | | |
|---|---|---|
| 612. 80 | Copper, other than alloys of copper; nickel silver and cupro-nickel_____ | \* \* \* |
| 612. 81 | Brass angles and channels_____ | \* \* \* |
| 612. 82 | Other _____ | 1.275¢ per lb. + 15% ad val. |

Illustrative exhibits 1 and 2 are short metal pieces, representative of the shape but not the length of the imported products at the time of importation. Mr. Louis D. Mann, vice-president of the plaintiff cor-

poration, testified that the imported products, which he called five-sided brass rods, were usually imported in 10- to 12-foot random lengths. Illustrative exhibit 3 is a collective exhibit of dimensional profile drawings submitted by the manufacturer as a basis for ordering the imported products.

Exhibits 1 and 2 are basically flat pieces of metal. Exhibit 1 measures approximately twelve-sixteenths of an inch and exhibit 2 approximately fourteen-sixteenths of an inch on the longest side denoting width; they are both about three-sixteenths of an inch thick. One edge of exhibits 1 and 2 is beveled one-half of the thickness along the length, at an angle that one surface or line makes with another when they are not at right angles. What we have in sum described appears to be a relatively flat metal product, imported in straight lengths of 10 to 12 feet, of solid cross section, with the length of one edge beveled to make a shape with five sides and five angles.

Plaintiff reckons that the imported products are brass "rods", because it has shown, as it has, that in the literal meaning of the term "rods" classified in the copper schedule, *supra*, the imported products are wrought straight lengths of pentagonal (i.e. having five sides and five angles) solid cross section. Defendant contends that the products are not "rods" because the sides and angles are unequal and the testimony [2] establishes, as it does, that in the brass industry, represented by the testifying witnesses, the term "pentagonal" is understood to denote shapes that have five equal sides and five equal angles of solid cross section. Both sides would have us turn the case on the common meaning of the term "pentagonal", which they agree the lexicons, in sum, define as a polygon having five angles and therefore, five sides, a regular pentagon being further defined as one having five equal sides and five equal angles, and an irregular pentagon as one having five sides and five angles not all of which are equal. Plaintiff would have us construe the common meaning of the term "pentagonal" in its non-restrictive literal sense as to include all five-sided products with five angles, whether equal or unequal, provided within the meaning of the term "rods", *supra*, they are "products of * * * solid cross-section, in straight lengths or in coils, and which if in coils is over 0.375 inch in maximum cross-sectional dimension." Defendant projects that we should construe the term "pentagonal" in accordance with the common meaning, but in the restrictive sense that commerce understands the common meaning.

The basic issue raised in these protests is whether the imported products are rods within the meaning of the copper schedule. The

---

[2] Seven industry witnesses testified for defendant. Defendant also moved in evidence a miscellany of pentagonal and other shapes, some with equal sides and equal angles, and some with unequal sides and unequal angles.

imported products are "shapes", as classified, if they "do not conform completely to the [definition] * * * set forth in * * * [the] headnote [*supra*] for bars, plates, sheets, strips, rods, or wire." If the imported products conform completely to the definition of "rods", as plaintiff claims, then quite obviously they should not be classified as "shapes". We discern obvious flaws that in our judgment make the contentions and arguments of both sides, as to the common meaning of the term "pentagonal", unacceptable bases for decision. Plaintiff's contention would lead us to disregard the meaning the copper schedule assigns the interrelated terms "bars", "plates", "sheets", "strip", "rods", and "wire", which we shall quote and discuss, *infra*. The statute does not permit that.

The commercial understanding of a rod of pentagonal shape and form as a product having five equal sides and five equal angles of solid cross section, in straight lengths, projected by defendant, is unacceptable because the tariff term "rods" is admittedly not a commercial designation. Absent proof that a tariff term is a commercial designation, the prevailing rule is that the common and commercial meaning are the same. *Marshall Field & Co.* v. *United States*, 45 CCPA 72, 80, 81, C.A.D. 676 (1958). Further as Mr. Shewmaker, assistant general counsel to the tariff commission, expressed it at the hearings on metal schedule 6, part 2, of the tariff schedules:

> * * * in the efforts of the trade to produce at least a modicum of uniformity, efforts have been made to set a dividing point. I might say here one reason for tariff purposes, that we have tried, all the way through these metal provisions, to establish definition is for the very reason that segments of industry do not always agree between themselves with respect to nomenclature and it makes for uncertainty in the tariff schedules if you depend entirely on trade practices.[3]

The meanings assigned the terms used in schedule 6, part 2, classifying so-called basic shapes and forms of copper, in our opinion, are a prime example of the emphasis placed in TSUS "on the development and use of objective standards for making product distinctions",[4] where the commercial designation of such products was obscure.

Common meaning is a rule of construction to ascertain the congressional intent when the intent cannot be determined from the statute or its legislative history. Cf. *Heads and Threads* v. *United States*, 56 CCPA 95, C.A.D. 960 (1969). It is well established that statutes are to be construed as a whole, *United States* v. *International Importers*, 55 CCPA 43, 46, C.A.D. 932 (1968); *Carvey & Skinner, Inc.* v. *United States*, 42 CCPA 86, C.A.D. 576 (1954), and interpreted "in the light of

---

[3] Tariff Classification Study, Schedule 6, page 619.
[4] Tariff Classification Study, Submitting Report, page 16.

all of the portions of the statute." *Dart Export Corp. et al.* v. *United States*, 43 CCPA 64, 74, C.A.D. 610 (1956). Upon consideration of the descriptive words used in the meanings assigned the various terms used in the copper subpart of schedule 6, part 2, and like descriptive words used in the meanings assigned to the same terms in the coordinate metal subparts of schedule 6, part 2, namely, the aluminum subpart D, we conclude that the imported products are "rods" as claimed.

The meanings attached to the wrought metals, including copper, in schedule 6, part 2, were assigned against a backdrop of considerable controversy and litigation [5] that resulted from "the silence of the existing [tariff] provisions with respect to the significant distinctions between the wrought and unwrought forms of the various metals and between each of the various wrought forms. Such distinctions as * * * [were] mentioned * * * [were] incomplete, obscure, and often incorrect. The existing provisions for 'rods' and 'wire' * * * [were] often in dispute as * * * [were] those for 'plate', 'sheet', and 'strip'." [6]

In addition, and as noted earlier, "segments of industry * * * [did] not always agree between themselves with respect to nomenclature". [7] While it may be that industry still does not agree, schedule 6, part 2, proposes to present the provisions for metals "in an organized, systematic manner" and to cover the subject completely. [8]

Schedule 6, part 2, is organized in a manner that there is a separate subpart for the base metals—iron and steel, copper, aluminum, nickel, tin, lead and zinc. In classifying the so-called basic shapes and forms of the base metals, the same terms are used in the various subparts. The striking fact about the subparts is the effort made in each subpart to produce at least a modicum of uniformity in the nomenclature of each base metal, without depending entirely on trade practices, by assigning the same terms different meanings in each subpart, and introducing into the various meanings dividing points for determining the classification of the so-called basic shapes and forms under the classifying terms. [9]

The tariff terms used to classify so-called basic shapes and forms of base metal, and the meanings assigned the terms to the end of developing objective standards for making product distinctions between the

[5] *Atlantic Aluminum & Metal Distributors, Inc.* v. *United States*, 47 CCPA 88, C.A.D. 735 (1960) ; *Scoville Manufacturing Co. et al.* v. *United States*, 43 Cust. Ct. 259, C.D. 2138 (1959) ; *Pheoll Manufacturing Company* v. *United States*, 40 Cust. Ct. 223, C.D. 1987 (1958) ; *H. J. Van Der Ryn, Inc., et al.* v. *United States*, 40 Cust. Ct. 90, C.D. 1964 (1958) ; *John V. Carr & Son, Inc.* v. *United States*, 33 Cust. Ct. 286, C.D. 1666 (1954) ; *Mohawk Iron & Steel Co.* v. *United States*, 30 Cust. Ct. 274, C.D. 1533 (1953).

[6] Tariff Classification Study, Schedule 6, page 87.

[7] n. 3.

[8] n. 6.

[9] See schedule 6, part 2, and compare subpart headnote 3 of subparts B (iron and steel), C (copper), D (aluminum), E (nickel), F (tin), G (lead), and H (zinc).

terms, are illustrated by the meanings assigned basic shapes in the context of the copper schedule, as follows:

SCHEDULE 6. – METALS AND METAL PRODUCTS

Part 2. – Metals, Their Alloys, and Their
Basic Shapes and Forms

\*        \*        \*        \*        \*        \*        \*

Subpart C. – Copper

Subpart C headnotes:

\*        \*        \*        \*        \*        \*        \*

3. For the purposes of this subpart, the following terms have the meanings indicated:

(a) Bars and plate: Products of solid rectangular cross section over 0.188 inch in thickness, in coils or cut to length, whether or not corrugated or crimped. Bars are not over 12 inches in width and plates are over 12 inches in width.

(b) Sheets and strips: Products of solid rectangular cross section not over 0.188 inch but over 0.006 inch in thickness, in coils or cut to length, whether or not corrugated or crimped. Sheets are over 20 inches in width; strips are not over 20 inches in width and do not include flat wire, as defined in (d) below.

(c) Rods: Products of round, half-round, quarter-round, oval, half-oval, triangular, pentagonal, hexagonal, octagonal, or decagonal solid cross section, in straight lengths or in coils, and which if in coils are over 0.375 inch in maximum cross-sectional dimension.

(d) Wire: A non-tubular product of any cross-sectional configuration, which if flat is in coils or straight lengths, not over 1.25 inches in width, not over 0.188 inch in thickness, and has all surfaces rolled or drawn, and which if not flat is not over 0.375 inch in maximum cross-sectional dimension and is in coils.

(e) Angles, shapes, and sections: Products which do not conform completely to the respective definitions set forth in this headnote for bars, plates, sheets, strip, rods, or wire, and do not include any tubular products.

\*        \*        \*        \*        \*        \*        \*

The first and, perhaps, foremost dividing point between the tariff terms used to designate the so-called basic shapes and forms of copper is the shape and form of the solid cross section. "Bars and plate" and "Sheets and strips" are products of solid rectangular cross section. Rods are products of solid cross section in the several shapes and forms specified in the headnote, *supra*. Wire is a non-tubular product (in ordinary sense a non-tubular product is a solid product) of any cross-sectional configuration, which must be read to include the

rectangular solid cross section specified for bars, plate, sheets, strips, and the several cross sections specified for rods, *supra*. As between products of solid rectangular cross-section the established further dividing points are thickness and width for "Bars and plate" and "Sheets and strips" and, in the case of "strips", restrictive language excluding "flat wire" that is "Wire" as defined in the headnote, *supra*.

The terms "Rods" and "Wire" in the statutory meaning are also related by cross section and form. "Rods" are products of the specified solid cross sections, in straight lengths or in coils. "Wire" is a non-tubular product (i.e. solid cross section) of any cross-sectional configuration (including those specified for "Rods") in coils or straight lengths. The term "wire," it will be noted, overlaps the term "rods" in that it includes the cross-sectional configurations specified for rods, and covers products in straight lengths and in coils, as does the term "rods". The division of the cross-sectional configurations in the meaning of the term "wire," into products "if flat" and "if not flat", leads us to conclude that the term "rods" of pentagonal solid cross section is not limited to products having five equal sides and five equal angles.

Of greatest significance to us is the fact that having related, as we have indicated, the meaning of the terms "rods" and "wire" by overlapping the cross-sectional configurations included in the terms, in straight lengths or in coils, the statute, in the meaning of the term "wire", divides the straight lengths and coils into products of any cross-sectional configuration (including "pentagonal") "if flat" and in coils "if not flat". The express mention of products, in straight lengths or in coils "if flat" and in coils, "if not flat", in the meaning of the term "wire", represents a dividing point between products of the same cross-sectional configuration. Coils and straight lengths, "if flat", must be not over 1.25 inches in width, not over 0.188 inch in thickness and have all surfaces rolled or drawn, in the meaning of the term "wire". Coils "if not flat" must not be over 0.375 inch in maximum cross-sectional dimension, in the meaning of the term "wire". Straight lengths "if not flat", it should be noted, are not included in the meaning of the term "wire". No similar distinctions, "if flat" and "if not flat", are made in the cross-section configurations specified for straight lengths and coils in the meaning of the term "rods". The imported products and defendant's exhibits in this case, nonetheless, illustrate that the "agonal" cross sections specified in the meaning of the term "rods" come in shapes that are produced "in flat" cross section and in cross section "not flat". Indeed, the statutory meanings themselves reveal a legislative understanding that products of the same cross-sectional configurations are produced in "flat" and "not flat" configurations. The statute having been carefully drawn to distinguish straight lengths and coils of the same cross-sectional configuration, "if flat" and "if not flat" in the meaning of the term "wire",

but not in the meaning of the term "rods", it is clear to us that the statute intends the meaning of the term "rods", in relation to the meaning of the term "wire", to include the cross-sectional configurations specified for "rods", "if flat" and "if not flat". Cf. *United States v. A. W. Faber, Inc.*, 16 Ct. Cust. Appls. 467, 470, T.D. 43211 (1929). This construction gives effect to all the language used by Congress compatible with the principle that the lodestar of all construction is to ascertain the intent of Congress. *United States v. Gulf Oil Corporation et al.*, 47 CCPA 32, C.A.D. 725 (1959).

The basic weakness in defendant's position that rods of pentagonal solid cross section, in straight lengths or in coils, means products which have five equal sides and five equal angles, is that the statute does not say that. Yet the coordinate aluminum subpart (subpart D) of schedule 6, part 2, indicates that when "agonal" descriptive words used to define the meaning of terms in a subpart, were intended to have a limited, restrictive, or modified sense, that sense was explicitly set forth in the meaning.[10]

For the reasons discussed, the protests are sustained. Judgment will enter for plaintiff.

(C.D. 4288)

---

[10] Schedule 6, part 2, subpart D headnotes:

3. For the purposes of this subpart, the following terms have the meanings indicated:

(a) Bars: Products of solid rectangular cross section, 0.25 inch or more in thickness and over 0.375 inch but not over 12 inches in width, in coils or cut to length; and [the following emphasis is added] *products of solid hexagonal or octagonal cross section, 0.375 inch or more in thickness (measuring the perpendicular distance between opposite faces) in coils, or of any thickness in straight lengths.*